**FEDERAL DEATH PENALTY CASE**
**\*\*\*\*EXECUTION SCHEDULED FOR JULY 13, 2020\*\*\*\***

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF INDIANA**
**TERRE HAUTE DIVISION**

| | | |
|---|---|---|
| **DANIEL LEWIS LEE** | : | |
| **Register Number 21303-009** | : | |
| **U.S. Penitentiary Terre Haute** | : | |
| **Terre Haute, IN 47802** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| **v.** | : | **Civil Action No. _____** |
| | : | |
| **WILLIAM P. BARR** | : | **CAPITAL CASE** |
| **Attorney General** | : | |
| **U.S. Department of Justice** | : | |
| **950 Pennsylvania Avenue, NW** | : | |
| **Washington, DC 20530;** | : | |
| | : | |
| **MICHAEL CARVAJAL** | : | |
| **Director** | : | |
| **Federal Bureau of Prisons** | : | |
| **U.S. Department of Justice** | : | |
| **320 First St., NW** | : | |
| **Washington, DC 20534;** | : | |
| | : | |
| **T.J. WATSON** | : | |
| **Complex Warden** | : | |
| **Federal Correctional Complex** | | |
| **Terre Haute** | : | |
| **4700 Bureau Road South** | : | |
| **Terre Haute, IN 47802;** | : | |
| | : | |
| **In their official capacities.** | : | |
| | : | |
| **Defendants.** | : | |

1

## COMPLAINT FOR INJUNCTIVE AND DECLARATORY RELIEF

### I.

### Nature of Action

1.  Plaintiff Daniel Lewis Lee ("Mr. Lee") brings this action for injunctive and declaratory relief for violations of his right to counsel 18 U.S.C. § 3599(e) and 28 C.F.R. § 26.4(b) and (c)(ii). On June 15, 2020, as the coronavirus pandemic worsened, Defendants made the decision to schedule Mr. Lee's execution at a prison, hundreds of miles from any of his attorneys, for July 13, 2020.  In scheduling Mr. Lee's execution, Defendants were obligated by law to ensure his access to counsel. However, by scheduling Mr. Lee's execution in the midst of this rapidly escalating national health emergency, Defendants have constructively denied Mr. Lee's right to access to counsel, including his specific right established by Defendants' own regulations to have counsel present in person during the seven days leading up to his execution and particularly his right to have them in attendance in person at the execution itself. Defendants have arbitrarily and capriciously set the execution date, without taking into account the serious, identifiable risk to counsel's health and safety, and done so not in accordance with the law.

### II.

### Parties

2.  Plaintiff Lee is a U.S. citizen and he is incarcerated at the United States Penitentiary in Terre Haute, Indiana ("USP Terre Haute").[1] He is a death-sentenced prisoner under the control

---

[1] Mr. Lee has proceeded in this Court in another unrelated matter *In Forma Pauperis*, and his status remains unchanged. *See Lee v. Warden,* No. 2:19-cv-00468-JPH-DLP, Doc. 2 (S.D. Ind. Sept. 26, 2019).

and supervision of the Federal Bureau of Prisons ("BOP"), an agency with the U.S. Department of Justice ("DOJ").  He is scheduled to be executed at USP Terre Haute on July 13, 2020.

3.   Defendant William P. Barr is the Attorney General of the United States. Mr. Lee was remanded into the Attorney General's custody upon Mr. Lee's conviction and the imposition of his death sentence.  Attorney General Barr oversees the BOP.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

4.   Defendant Michael Carvajal is the Director of the BOP.  He oversees the operations of BOP facilities, staff, and individuals in BOP custody, and serves the Attorney General and the Deputy Attorney General.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

5.   Defendant T.J. Watson is the Warden of the Federal Correctional Complex at Terre Haute (which includes USP Terre Haute), where Mr. Lee is confined.  In that position, he is charged with the management of USP Terre Haute and the oversight and implementation of operations and policies there.  He is sued here in his official capacity for the purpose of obtaining declaratory and injunctive relief.

6.   Defendants are acting, and each of them at all times relevant hereto were acting, in their respective official capacities with respect to all acts described herein, and were in each instance acting under color and authority of federal law in violating Mr. Lee's rights. Upon information and belief, unless preliminarily enjoined, each of the Defendants intends to act in his official capacity and under the authority of federal law in violating Mr. Lee's constitutional rights.

### III.

### Jurisdiction, Venue, and Applicable Law

7. This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 2201 and 2202. Title 28 U.S.C. § 2201 provides for injunctive relief for a claim that arises under the United States Constitution and federal law. Title 28 U.S.C. § 2202 provides for further necessary or proper relief based upon a declaratory judgment issued under 28 U.S.C. § 2201. Title 5 U.S.C. § 702 waives sovereign immunity for an action seeking relief other than monetary damages against an agency official acting in his official capacity. An actual controversy exists between Mr. Lee and Defendants because Defendants have arbitrarily and capriciously and in violation of law, deprived Mr. Lee of his right of access to counsel, established by 18 U.S.C. § 3599(e) and by 28 C.F.R. § 26.4.

8. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) because Mr. Lee is incarcerated in this district,  the Defendant Watson is in this district and because a substantial part of the events giving rise to Mr. Lee's claims has taken place in this district and will continue to take place in this district, including his forthcoming execution.

9.

10. 18 U.S.C. § 3599(e) of the Federal Death Penalty Act ("FDPA") provides in relevant part that a death-sentenced prisoner is entitled to qualified counsel throughout every stage of proceedings subsequent stage of proceedings, including "all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures," and "in such competency proceedings and proceedings for executive or other clemency as may be available to the defendant."

11. 28 C.F.R. § 26.4(b) provides in relevant part that "[b]eginning seven days before the designated date of execution, the prisoner shall have access" to "[t]wo defense attorneys."

12. 28 C.F.R. § 26.4(c)(ii) provides in relevant part that, "the following persons shall be present at the execution: …Two defense attorneys."

**IV.**

**<u>Factual Background</u>**

**A.      Factual Allegations Pertaining to the Date Set for Mr. Lee's Execution**

13. Mr. Lee was sentenced to death in 2002 in the United States District Court for the Eastern District of Arkansas, Central Division.

14. On Monday, June 15, 2020, DOJ announced publicly that Attorney General William Barr had directed the BOP to set execution dates for Mr. Lee and three other men.  Mr. Lee's execution date was set for July 13, 2020.

15.  That evening, this information was communicated to Mr. Lee via letter, signed and hand-delivered by Defendant Warden Watson to Mr. Lee, which purported to be Mr. Lee's "official notification that pursuant to Title 28, Code of Federal Regulations, Section 26.3(a)(1), the Director of the Federal Bureau of Prisons has set July 13, 2020, as the date for execution by lethal injection."[2]

**B.      Factual Allegations Pertaining to Defendants' Cancellation of Legal Visits at USP Terre Haute Due to the Novel Coronavirus Beginning March 13, 2020.**

16. The SARS-CoV-2 virus, and the human infection it causes – COVID-19 – is a global pandemic, was designated a global health emergency by the World Health Organization, and was declared a national emergency on March 13, 2020, by President Donald Trump.

17.  In his Proclamation, declaring this state of national emergency, President Trump noted that "[t]he spread of COVID-19 within our Nation's communities threatens to strain our Nation's

---

[2] Attached hereto as Exhibit A.

healthcare systems. As of March 12, 2020, 1,645 people from 47 States have been infected with the virus that causes COVID-19." *Proclamation on Declaring a National Emergency Concerning the Novel Coronavirus Disease (COVID-19) Outbreak* (issued on March 13, 2020).[3]

18. In the ensuing four months, those numbers have skyrocketed. As of July 9, 2020, the number of cases in the United States is 3,106,931, with 59,260 new cases reported since yesterday. There have been a total of 132,855 reported deaths. Forty-one jurisdictions have reported more than 10,000 cases apiece.[4]

19. As of July 10, 2020, the number of cases in Indiana is 51,079 with 793 new cases reported since yesterday. There have been a total of 2,563 reported deaths.[5]

20. In order to prevent the spread of the virus into federal correctional facilities, the BOP announced on March 13, 2020, a 30-day suspension of visits to prisoners at all their institutions. This included halting legal visits.[6]

21. In its March 13, 2020, announcement, the BOP also suspended (with minor exceptions): official staff travel; all staff training; inmate movement; and tours. These restrictions have been extended several times and remain in place at this time.[7]

---

[3] Available at: https://www.whitehouse.gov/presidential-actions/proclamation-declaring-national-emergency-concerning-novel-coronavirus-disease-covid-19-outbreak/ (last visited July 5, 2020).

[4] Cases, Data & Surveillance: Cases in the U.S., Centers for Disease Control and Prevention ("CDC"), updated July 9, 2020, https://www.cdc.gov/coronavirus/2019-ncov/cases-updates/cases-in-us.html (last visited July 11, 2020).

[5] Indiana COVID-19 Data Report, updated July 10, 2020, https://www.coronavirus.in.gov/2393.htm (last visited July 11, 2020).

[6] Federal Bureau of Prisons COVID-19 Action Plan, updated March 13, 2020, https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited July 10, 2020).

[7] See BOP Modified Operations, https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 9, 2020).

22.  Between March 13, 2020, the date of the President's declaration of a national emergency, and June 15, 2020, the date on which Mr. Lee was notified of this July 13, 2020, execution date, USP Terre Haute remained closed to visitation, legal and otherwise.

23. The health concerns that prompted these restrictions on visits and staff travel have not abated since March, 2020.  To the contrary, numbers of COVID-19 infections are spiking at alarming rates in many areas of the country. Just yesterday alone, there were over 59,000 new cases in the United States.  The Government's top infectious disease expert, Dr. Anthony Fauci, testified to Congress that the current situation "puts the entire country at risk."  He warned that we could soon see more than 100,000 new cases each day if strict precautionary measures were not adhered to.  *See* Sheryl Gay Stolberg and Noah Weiland, "Fauci Says U.S. Could Reach 100,000 Virus Cases a Day as Warnings Grow Darker," New York Times, June 30, 2020.[8]

24. USP Terre Haute remains closed for legal and other visits for all prisoners other than for an exception informally announced for those with upcoming execution dates.[9]

**C.**  **Factual Allegations Pertaining to the Health Risks Associated with and Transmission of COVID-19**

25.  The SARS-CoV-2 virus, and the human infection it causes – COVID-19 – is a global pandemic, was designated a global health emergency by the World Health Organization, and was declared a national emergency on March 13, 2020, by President Donald Trump. Exh. B, Declaration of Chris Beyrer, MD, MPH (hereafter "Beyrer Decl.")  ¶¶ 7, 10.

---

[8] Available at: https://www.nytimes.com/2020/06/30/world/coronavirus-updates.html (last visited July 11, 2020).

[9] It is counsel's understanding, though they have received no BOP program statement or other formal statement to this effect from the prison, that they may visit Mr. Lee at Terre Haute now that his execution date has been set – should they wish to assume the attendant risks.

7

26.     Although many recover from the disease, the fatality rate associated with it is significant. *Id.* at ¶¶ 14, 28. To date, there is no vaccine, known cure, or definitive treatment for COVID-19. *Id.* at ¶¶ 24, 116. Even when not fatal, it can wreak havoc on the body—damaging vital organs, causing permanent loss of respiratory capacity, and affecting brain and neurological function, among other complicating effects.

27.     This disease has been difficult to contain in part because the course of the illness in any particular person is unpredictable: some people with COVID-19 may have no symptoms or "mild" symptoms,[10] while others can develop severe illness that can lead to death, or long-term, potentially permanent health complications. *Id.* at ¶¶ 28-38. There are several known risk factors for fatality or for developing the other serious complications arising from COVID-19, including, for example, age,[11] gender,[12] hypertension, heart disease, cancer, type 2 diabetes, and obesity. *Id.* at ¶¶ 40-45.

28.     The virus passes from person to person when an infected individual expels respiratory droplets into the air through, for instance, speaking or sneezing. "These droplets can

---

[10] The "mild" symptoms are not insignificant and can last for months, even in young and previously healthy individuals: they include "fever, chills, cough, shortness of breath, fatigue, muscle or body aches, headache, new loss of taste or smell, sore throat, congestion or runny nose, nausea or vomiting, and diarrhea." Exh. B, Beyrer Decl., ¶¶ 31-32.

See also, *Symptoms of Coronavirus*, Centers for Disease Control and Prevention, (noting "This list does not include all possible symptoms.") https://www.cdc.gov/coronavirus/2019-ncov/symptoms-testing/symptoms.html (last visited July 11, 2020); Ed Young, *COVID-19 can last for several months*, The Atlantic, June 4, 2020 Available at: https://www.theatlantic.com/health/archive/2020/06/covid-19-coronavirus-longterm-symptoms-months/612679/ (last visited July 11, 2020).

[11] In Indiana (which is typical of most areas of outbreak), the "case-fatality" ratio as one advances in age is alarming: for 40-49 year olds, it is 1.86%; for 50-59 year olds, 5.12%; 60-69 year olds, 16.38%; 70-79 year olds, 24.55%; and for those over 80, 51.12%. *Id.* at ¶ 39.

[12] Males are more likely to die of COVID-19 than females. *Id.* at ¶ 44.

land in the mouths or noses of people who are nearby or be inhaled into the lungs.  Spread is more likely when people are in close contact with one another."[13]

29.     It can be contracted from contact with hard surfaces, where it can linger for hours to days, or it can spread through aerosolized fecal contact (in, for example, pubic bathrooms). *Id.* at ¶¶ 46, 59.

30.     The length of time a person spends in an environment that harbors the virus increases his or her chance of contracting it.[14]  While a very short period of time may be enough for someone to contract it if the viral load is heavy, a longer period of time in the presence of even a small amount of virus increases the chance of infection.

31.     For contact tracing purposes to determine a high likelihood of exposure, "close contact" is often defined as within 6 feet for more than 3 minutes.

32.     Individuals who are pre-symptomatic are believed to be most infectious in the two to three days before their symptoms develop.[15]  People who never develop symptoms can still infect others. As a result, individuals are carrying and spreading the virus to those around them without knowing it. This is a major contributing factor to increased spread, made more complicated by the use of ineffective screening measures and limited and inconsistent testing availability. *Id.* at ¶¶ 11, 13, 48-51.

---

[13]     *Frequently Asked Questions*, CDC, updated July 3, 2020. https://www.cdc.gov/coronavirus/2019-ncov/faq.html (last visited July 10, 2020).

[14]   *How COVID-19 Spreads,* CDC, updated June 16, 2020. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited July 10, 2020).

[15] *How COVID-19 Spreads*, CDC, updated June 16, 2020. https://www.cdc.gov/coronavirus/2019-ncov/prevent-getting-sick/how-covid-spreads.html (last visited July 10, 2020).

33.    Even when significant mitigating measures are employed—mask wearing, social distancing, frequent hand-washing, disinfecting high-touch surface areas, among them—it does not guarantee full protection from contracting the disease. *See, e.g., id.* at ¶ 55, 58.

34.    Once contracted, COVID-19 can cause severe damage to lung tissue, including a permanent loss of respiratory capacity.  It can also permanently damage tissues in other vital organs, as well, such as the heart, central nervous system, and liver. *Id.* at ¶¶ 33 and 34.

35.    There are multiple mechanisms by which COVID-19 kills.  Among patients who have more serious disease, some 30% will progress to Acute Respiratory Distress Syndrome (ARDS), a condition in which oxygen levels in the blood and blood pressure falls dramatically. ARDS has a 30% mortality rate overall, higher in those with other health conditions. Some 13% of these patients will require mechanical ventilation. [16]

36.    COVID-19 can also cause heart damage, blood clots, and constriction of blood vessels, all of which can play a role in causing death.  Kidney failure can also be involved in COVID-19 mortality.  Exh. B, Beyrer Decl., ¶ 36.

34.    COVID-19 can severely damage lung tissue, which requires an extensive period of rehabilitation, and in some cases, cause permanent loss of breathing capacity. COVID-19 may also target the heart, causing a medical condition called myocarditis, or inflammation of the heart muscle. Myocarditis can reduce the heart's ability to pump.  *Id.* at ¶ 37.

35.    A "cytokine storm," which can come in the wake of a COVID-19 infection, is an exaggerated response of the immune system in which a flood of inflammatory signaling molecules

---

[16]    Sinha, Matthay & Calfee, *Is a "cytokine storm" relevant to COVID-19?,* JAMA Internal Medicine, June 30, 2020.  Available at: https://jamanetwork.com/journals/jamainternalmedicine/fullarticle/2767939 (last visited July 10, 2020).

are unleashed onto the body. These molecules cause blood vessels to become leaky, resulting in a drop in blood pressure. Blood clots become more likely to form and obstruct vessels. Organs may not get the oxygen they need to function. *Id.* at ¶ 38.

36.     There are multiple estimates of the ratio between all known cases and known deaths (the "case-fatality ratio") for COVID-19 across different states. For example, on June 200, 2020, the case-fatality ratio by age in Indiana was as follows. *Id.* at ¶ 44. These estimates are representative of trends in most states, in which mortality rises steeply above 60-70 years of age:

| | |
|---|---|
| 0-19 | 0.08% |
| 20-29 | 0.21% |
| 30-39 | 0.68% |
| 40-49 | 1.86% |
| 50-59 | 5.12% |
| 60-69 | 16.38% |
| 70-79 | 24.55% |
| 80+ | 51.12% |

37.     The COVID-19 mortality rate is twelve times higher among those with underlying conditions. Specifically, 19.5% of people with COVID-19 who had underlying health conditions died as compared to 1.6% of those without underlying conditions. *Id.* at ¶ 41.

38.     Epidemiologists have collected additional demographic data on populations of COVID sufferers. Individuals with obesity are about twice as likely to be hospitalized with COVID-19. Younger patients with obesity are more likely to require hospital admission and ICU care when infected than their non-obese counterparts. Black and Latinx individuals have also been disproportionately affected by COVID-19. Males are more likely to die of COVID-19 than females. *Id.* at ¶¶ 42-44.

39.     To be classified as a confirmed case of COVID-19, an individual must meet confirmatory laboratory evidence. A viral test identifies people with current SARS-CoV-2

infection. Additionally, antibody tests can be used to identify people with a previous viral infection. To be determined a confirmed case, an individual must have undergone diagnostic testing, which is often limited in availability. *Id.* at ¶ 11. If diagnostic testing is limited, either by availability or by choice, the number of actual infected individuals may greatly exceed the number of reported confirmed cases.

40.     The Indiana State Department of Health confirmed its first case of COVID-19 on March 6, 2020 and recorded its first death due to the virus on March 16.[17]

41.     Children, while initially thought to be safe from effects of the virus, are now recognized as being susceptible to multisystem inflammatory syndrome (MIS-C) associated with COVID-19. On May 18, 2020, Indiana confirmed its first case of MIS-C in a child.[18]

42.     On July 10, 2020, Indiana reported 793 new cases, for a total of 51,079 total cases, and a total of reported deaths numbering 2,563. Of those individuals tested for the virus, 9.2% tested positive. [19] The total number of cases jumped by over 10,000 since June 15, 2020, when Attorney General Barr announced that Mr. Lee's execution date was set for July 13, 2020.[20]

43.     On July 1, 2020, Indiana Governor Eric Holcomb renewed the COVID-19 public health emergency to extend from July 4 (the then-current expiration date) to August 3, 2020, "unless further renewed." *Executive Order 20-34*, *for: Fourth Renewal of Public Health*

---

[17] *2019 Novel Coronavirus (COVID-19),* IN.gov., https://www.coronavirus.in.gov/ (last visited July 11, 2020).
[18] *Id.*
[19] *Indiana COVID-19 Data Report,* IN.gov, updated July 10, 2020, 11:59 p.m. https://www.coronavirus.in.gov/2393.htm (last visited July 11, 2020.)
[20] *Id.*

*Emergency Declaration for the COVID-19 Outbreak,* ¶ 2, State of Indiana Executive Department.[21]

44.     COVID-19 cases continue to rise across the United States. While there has been variation in COVID-19 trends across states "this week's national ensemble forecast predicts that there will likely be between 140,000 and 160,000 total reported COVID-19 deaths by August 1st," with the number of new deaths rising in at least 12 states, and holding even in the rest.[22]

45.     In recognition of the dangers posed by the virus, federal agencies have taken serious measures to stem the spread of disease within their ranks and into the community. For example, on June 24, 2020, the United States Fleet Forces Command of the United State Navy recently ordered all service members in the continental United States to limit travel to/from place of residence/work with stops only for essential business (food, medical pharmacy, gas, and child care services); it further restricted service members from engaging in many activities including dining in restaurants, attending indoor religious services, and from gathering in groups of over ten. This order applies even where local authorities have authorized reopening of the community. As the Navy order notes, the "medical intelligence analysis is clear" and "[a]symptomatic spread is a reality and one misstep opens a potential attack vector for this virus." The FRAGO also ordered that, to the maximum extent practical, not only service members, but government civilians, family members and contract employees should minimize unnecessary use of mass transit, curb-side and

---

[21] Available at: https://www.in.gov/gov/files/Executive%20Order%202020-34%20Extention%20of%20the%20Public%20Health%20Emergency.pdf (last visited, July 10, 2020.)

[22] https://www.cdc.gov/coronavirus/2019-ncov/covid-data/forecasting-us.html (Last visited July 11, 2020)

drive through services, banking services, post office, pet care and veterinary services, and drive-in spiritual services.[23]

46.      In March, 2020, the Office of Management and Budget issued a memorandum to the heads of all executive agencies regarding travel restrictions for federal employees in response to the coronavirus. It declared that "[o]nly mission-critical travel is recommended at this time," and that due consideration should "be given to whether a Federal employee who would be traveling falls within a population(s) at higher risk for serious complications from COVID-19."[24]

47.      The OMB memorandum also cautioned that "[t]ravel by any Federal employee to or within areas where there is community spread of COVID-19 should only be undertaken when there is an urgent need, such as to protect life and property." That memorandum is still operative.

48.      In May, 2020, DOJ itself warned of the dangers of COVID-19 and addressed the need to protect its staff. In a memorandum distributed to all heads of department components and United States Attorneys,[25] it recognized that vulnerable populations and those caring for family members in vulnerable populations should be allowed to telework and that only essential travel should be permitted for all employees, followed by mandatory quarantine in certain regions. It further directed that department components "should continue to cancel or postpone large events until national conditions permit more widespread travel and close proximity attendance," and

---

[23]      Tammy Watt, *New FRAGO details 'what is & isn't allowed' for service members*, American Security Today, June 26, 2020. https://americansecuritytoday.com/new-frago-details-what-is-isnt-allowed-for-service-members/  (last visited July 10, 2020).

[24] *See* M-20-14 Updated Federal Travel Guidance in Response to Coronavirus (March 14, 2020) (available at: https://www.whitehouse.gov/wp-content/2020/03/M-20-14-travel-guidance-OMB-1.pdf) (last visited July 1, 2020)

[25] *See* Department Framework for Returning to Normal Operations Status (May 18, 2020) (available at: https://www.justice.gov/doj/page/file/1284406/download) (last visited July 1, 2020).

noted that it did not "anticipate restoration of postponed Department events, or scheduling of in-person new events, particularly large events, to occur in the immediate future...*In July we will assess whether we can more broadly return to in-person event scheduling and travel.*"[26]

49.     The most dangerous transmission scenarios for transmission and exposure are indoor environments with poor ventilation in which people are close together. Research suggests that speech droplets which carry the virus that causes COVID-19 can linger in the air in closed environments for 8 to 14 minutes.  A study currently under review found that among 1,245 cases during the COVID-19 outbreak in China, there was only one case of COVID-19 transmission that was in an outdoor environment, highlighting the overwhelming predominance of COVID-19 transmission in indoor environments. Exh. B, Beyrer Decl., ¶ 54.

50.     While wearing face masks helps to mitigate transmission of SARS-CoV-2, it does not guarantee full protection. When wearing non-N95 face masks, social distancing must be maintained to avoid acquiring the virus.  The two measures must be taken in combination – wearing a mask *and* social distancing. *Id.* at 55-56.

51.     Poorly ventilated spaces increase the likelihood of COVID-19 transmission. Some airflow studies have found that respiratory droplets can travel between people even from 10 feet away, suggesting that even the social distancing recommendation of 6 feet may be insufficient depending on ventilation.  Airflow direction may also influence transmission. One case report from China found that a cluster of infections mapped onto the direction of air conditioning flow through a restaurant. *Id.* at 57.

52.     The onset and duration of viral shedding, which propagates spread, and the period of infectiousness for COVID-19, are not well understood, and therefore, cannot be easily

---

[26] *Id.* (emphasis added).

prevented.  Epidemiologists report that individuals who are contagious do not necessarily show symptoms, either because they are asymptomatic (i.e. has a mild enough case of the virus that they are unaware they have it) or because they are pre-symptomatic.  A pre-symptomatic person will go on to develop symptoms but can be infectious for up to 3 days before symptoms first develop. *Id.* at 47-49.

53.      The combined effect of asymptomatic and pre-symptomatic carriers is thought to account for a substantial portion of SARS-CoV-2 transmission, with some estimates putting it at between 50 to 80% of all transmission. *Id.* at 51.

54.      The BOP is not testing staff as part of its staff screening program.

55.      In March, the BOP employed a screening tool for visitors, volunteers and contractors seeking entrance to a prison that asked if the individual had fever or chills, cough, or shortness of breath, and required a temperature check.  The form also asked if the person had traveled within the previous 14 days to China, Iran, South Korea, Italy, or Japan, or had had close contact with anyone "diagnosed" with the COVID-19 illness with the last 14 days.  According to the BOP website, this remains the screening tool being used for visitors to BOP prisons.  *See BOP Visitor/Volunteer/Contractor COVID-19 Screening Tool*[27] and *BOP Implementing Modified Operations.*[28]

56.      The BOP is employing a staff screening tool that requires a temperature check, and an employee self-report as to whether he or she has a "new on-set cough," "new onset trouble

---

[27] Available at: https://www.bop.gov/coronavirus/docs/covid19_screening_tool.pdf (last visited July 5, 2020).

[28] Available at: https://www.bop.gov/coronavirus/covid19_status.jsp (last visited July 5, 2020).

speaking because of needing to take a breath," or "stuffy/runny nose." With a temperature above a certain designated point, the staff member is to be denied access. But with a yes answer to the other screening questions, the staff member is only instructed to "contact the medical officer on call for the Institution to provide Disposition." *See Coronavirus Disease 2019 (COVID-19) Staff Screening Tool,* March 27, 2020.[29]

57.     Because asymptomatic and pre-symptomatic carriers are infectious at stages of the virus, screening measures that do not include testing, such as restricting access to buildings if someone has a fever or symptoms, do little to prevent the introduction of the virus into any environment.

58.     Based on data collected in a study conducted by the Indiana University Richard M. Fairbanks School of Public Health, researchers estimated that 43% of all Indiana residents who were currently infected showed no symptoms. *IUPUI, ISDH release findings from 2nd phase of COVID-19 testing in Indiana*, June 17, 2020.[30]

59.     This number strongly suggests that a large percentage of those people who successively would pass the BOP's screening test and be admitted in its prisons would nevertheless have an active case of COVID-19.

**D.     Facts Pertaining to COVID-related Dangers to Travelers, Including Counsel.**

---

[29] Available at: https://www.bop.gov/coronavirus/docs/covid19_staff_screening_tool_v2.8_20200327.pdf (last visited July 5, 2020.)

[30] Available at: https://calendar.in.gov/site/isdh/event/iupui-isdh-release-findings-from-2nd-phase-of-covid-19-testing-in-indiana/ (last visited July 10, 2020).

60.     USP Terre Haute, where Mr. Lee in incarcerated and where he will be executed, is located in Terre Haute, Indiana.

61.     Mr. Lee, in connection with his previously scheduled execution date in December 2019 and the currently scheduled execution date of July 13, 2020, has gone through the requisite BOP procedures to indicate his desire to have counsel present at his execution and listed them specifically in the documents relevant to those procedures. Counsel would have chosen to be present were it not for the risks to health and safety posed by traveling to and from USP Terre Haute for the July 13, 2020 execution in the deteriorating public health crisis. Counsel for Mr. Lee reside in various places around the country, none local to Terre Haute.  These include: Chicago, Illinois; Houston, Texas Portland, Maine; Philadelphia, Pennsylvania; Washington, D.C.; and Chapel Hill, North Carolina..

62.     Two of Mr. Lee's lawyers are over the age of sixty, two are in their 50's, and two are in their 40's.

63.     Each of Mr. Lee's lawyers either has an underlying health condition that puts him or her at increased risk for death and other bad outcomes from COVID-19, and/or is responsible for family members with such vulnerabilities.

64.     Travel to Terre Haute for any of Mr. Lee's lawyers to Terre Haute would require a multi-state trip over hundreds of miles, and overnight hotel stays.

65.     Travel has the potential to seed new outbreaks across the country. The outbreak of COVID-19 in New York is estimated to be responsible for 60-65% of cases nationwide, and travel from Seattle spread the virus to at least 12 different states.  Exh. B, Declaration of Chris Beyrer at 22.

66.     Every stage and mode of travel involves significant risks of exposure for the traveler. *Id.* at 61.

67.     All airports pose a risk of COVID-19 due to the need to stand in security lines, as well as exposure to high contact surfaces, close proximity to others, and spending extended periods of time in an indoor environment. *Id.* at 62.

68.     The amount of time spent in airports in cities with higher cases counts increases one's risk of exposure to an infected person or surface. *Id.*

69.     This means traveling from, laying over, and arriving into cities with higher case counts increases one's risk of exposure, as well.

70.     Air travel itself, separate and apart from the hazards of being in airports, can lead to numerous risks of transmission. *Id.* at ¶ 70.

71.     While the risk of transmission depends in part on the number of individuals on a plane, and the amount of space left between them, social distancing is largely impossible on planes.[31]

72.     Universal mask wearing, especially on long flights during which passengers must remove their masks to eat or drink, is largely unenforceable. *Id.* at ¶ 73.

---

[31]  Where some airlines have promised to block middle seats as a safety precaution, Josh Earnest, United's chief communications officer, said on July 1 that blocking middle seats is just a PR strategy.  "When you're onboard the aircraft, if you're sitting in the aisle, and the middle seat is empty, the person across the aisle is within six feet from you, the person at the window is within six feet of you, the people in the row in front of you are within six feet of you, the people in the row behind you are within 6 feet of you." Chris Fuhrmeister, *Delta reiterates middle-seat policy after criticism from United*, Atlanta Business Chronicle, July 1, 2020.  Available at: https://www.bizjournals.com/atlanta/news/2020/07/01/delta-blocking-middle-seat-united-criticism.html (last visited July 10, 2020).  In other words, ***there is no way to social distance on commercial airlines.***

73.     Air circulation on planes may not be uniform or subject to the control of an individual passenger.  A fellow traveler, for example, may choose to increase the air flow from his personal vent or point it away from himself, towards another passenger. *Id.* at ¶ 72.

74.     Taking cabs and other car services leads to close contact with the driver, who may spread the virus.  A study from Zhuhai, China found that sharing a car with someone infected significantly increased the risk of that person then becoming infected.[32]  In addition, if cab owners do not wipe down the interior after each passenger, there may be residual risk of infection from the prior trip. *Id.* at ¶ 76.

75.     The risk of infection from using public restrooms varies, depending on how often and how thoroughly they are cleaned.  However, the distance between bathroom stalls and sinks may not provide adequate distancing, especially in an environment that may seem private enough for one to remove his or her mask. And, as noted earlier, new information indicates that COVID-19 may also be transmissible through aerosolized fecal contact. *Id.* at ¶ 77.

76.     The risks from staying in a hotel includes the virus remaining on surfaces if rooms were not properly cleaned. This may occur if staff who clean the rooms are infected but are not taking proper precautions (wearing a mask, washing their hands, etc.) or are engaging in any improper cleaning practices (using cleaners that are too weak, for instance). *Id.* at ¶ 78.

77.     During check-in, as well, it may be difficult to remain 6 feet or more from others, including guests and staff. It may also be difficult to avoid elevators which present a risk of

---

[32] Jian Wu et al., "Household Transmission of SARS-CoV-2, Zhuhai, China, 2020," *Clinical Infectious Diseases: An Official Publication of the Infectious Diseases Society of America*, May 11, 2020, Available at: https://doi.org/10.1093/cid/ciaa557 (last visited July 6, 2020).

infection, as they are a close, confined space. Individuals who are infected may touch the buttons or join others in the elevator, thus exposing others to the virus. *Id.* at ¶ 79.

78.      It is presumably for these reasons that federal government agencies, including the DOJ and the BOP suspended most official travel.  *See Federal Bureau of Prisons COVID-19 Action Plan: Agency-wide Modified Operations*, March 13, 2020;[33]  *Memorandum from Lee Lofthus, Assistant Attorney General for Administration to Heads of Department Components and United States Attorneys*, U.S. Department of Justice, Justice Management Division, May 18, 2020.[34]  *See also, Federal Judiciary COVID-19 Recovery Guidelines*, at p. 9, April 24, 2020 (requiring employees to maximize physical distance from others;   instructing all vulnerable individuals so continue teleworking, including employees who live with or provide care for

---

[33]  Available at:  https://www.bop.gov/resources/news/20200313_covid-19.jsp (last visited July 5, 2020).

[34]  Available at:  https://www.justice.gov/doj/page/file/1284406/download (last visited July 5, 2020).  In this memorandum, it was announced that "[o]nly essential travel is permissible in Phase 1.  Staff traveling to areas that still have significant levels of COVID-19 cases must follow the CDC quarantine guidelines before returning to the office.  … [T]ravel to significant outbreak areas should be considered only in light of the state/locality operating announcements and, as noted above, travelers are subject to the CDC post-travel isolation guidelines.  *As a general matter*, routine travel for discretionary training, events, conferences, speeches and the like should continue to be postponed in Phase 1 and Phase 2 (considering both departure points and destinations). … In July we will assess whether we can more broadly return to in-person even scheduling and travel."  (emphasis added.)

In this same memorandum, DOJ "recognizes that some employees are in vulnerable populations or may be at higher risk for severe illness, or are caring for family members or others in these groups. . . . Those at higher risk for severe illness include individuals who are over 65 years of age and people of all ages with underlying medical conditions, particularly if not well controlled, including those who suffer from chronic lung disease, moderate to severe asthma, serious heart conditions, immune disorders, obesity, diabetes, or chronic kidney or liver disease should work with supervisors to continue telework."  These employees are to be afforded workplace flexibilities to "help reduce the chances that they could carry the virus to these vulnerable individuals."

vulnerable individuals to "reduce chances that they could carry the virus to these vulnerable individuals," and notably, "MINIMIZE PERSONAL TRAVEL (i.e., leisure travel, non-business related) and adhere to CDC guidelines and local state orders regarding travel destination and potential for self-isolation upon return." [35]

**F.      Facts pertaining to the risks counsel face visiting at USP Terre Haute and attending the execution.**

79.     As noted above, the greatest risks for transmission of COVID-19 result from spending time in an enclosed indoor space without the ability to maintain social distancing and where one is in contact with someone who has the virus.  Wearing masks does not protect the wearer, and one's eye membranes are an entry point for the virus.  Sharing toilet facilities creates additional risk, as fecal matter may be aerosolized when one flushes a toilet, and surfaces within a bathroom may become contaminated.

80.     For counsel to witness Mr. Lee's execution, they would of necessity be in contact with many other people in close proximity to them.

81.     Counsel will not be permitted to come to the prison grounds in their own vehicles but will be escorted there by BOP personnel.

82.     Counsel will be brought into the main prison and kept there for some period of time before being escorted to the execution facility.

---

[35] Available at:  https://www.fedbar.org/wp-content/uploads/2020/04/Federal-Judiciary-COVID-19-Recovery-Guidelines.pdf (last visited July 5, 2020).

83.     Prisons are known to have poor infection control mechanisms available, and are often hotspots for infectious diseases, including SARS-CoV-2, as well as HIV, tuberculosis, hepatitis viruses, influenza, and others. Exh. B, Beyrer Decl. at ¶ 83.

84.     As with other contaminate environments, like nursing homes, to receive basic necessities, prisoners are required to interact with numerous correctional officers daily: to receive food, receive medication, be let outside into recreational facilities. One infected correctional officer can spread infections between different areas of the prison. *Id.* at ¶ 84.

85.     As noted above, the screening of staff conducted at USP Terre Haute does not provide adequate measures to detect infected staff members or other personnel with whom Plaintiffs might have to interact.

86.     It is evident the screening measures at USP Terre Haute have permitted the virus to gain entry there because both prisoners have contracted the virus, and at least one inmate has died of COVID-19.

87.     The execution team itself comprises approximately 40 people.  This includes senior DOJ personnel, government witnesses, DOJ lawyers, members of the Marshals service, the execution team, and outside contractors. Exh. C.  Declaration of Rick Winter including attached BOP Execution Protocol ("Winter Decl.") at ¶ 11.

88.     These 40 people will be conducting practice executions in the days leading up to July 13, 2020, and will be interacting with one another. Because they will be inhabiting close quarters for extended periods of time during these training exercises, one infected individual has the potential to transmit the virus to many others, including those who are in contact with counsel. *Id.*.

89.     Counsel will be escorted by prison personnel into the execution facility. *Id.* at page 26.

90.     On information and belief, the execution "house" consists of several small rooms. The execution chamber is the room where Mr. Lee will actually be executed.  Surrounding that room are several others. There is an entrance into the execution chamber from the cell in which Mr. Lee will stay prior to the execution.

91.     On information and belief, there is also an inmate witness room, a media room, a room for government witnesses, and a victim witness room, for the eight witnesses permitted to represent the victims and the victim's family.

92.     On information and belief, there will be two BOP staff members in the room with counsel.

93.      At each stage of these proceedings, which are likely to last several hours, counsel will be in the company of Defendants' staff in circumstances during which social distancing is not possible.

94.     At each stage of these proceedings, which are likely to last several hours, counsel will be captive participants, unable to walk away if their escorts remove their masks.

95.     BOP has indicated that it will provide personal protective equipment to witnesses, but only if they desire it.  Counsel will not be protected against the risk of exposure caused by those who choose not to wear such equipment.

**G.     Facts Pertaining to the Role of Counsel During End-Stage Litigation**

96.    Counsel representing a client facing an execution face a wide array of duties.. Exh. D, Declaration of George H. Kendall ("Kendall Decl."), at ¶ 6.

97.    These duties are based on the ABA's Model Rules of Professional Conduct, and further defined by the ABA Guidelines for the Appointment and Performance of Counsel in Death Penalty Cases.  Kendall Decl., at ¶ 7; Exh. E, Declaration of Bruce Green ("Green Decl."), at ¶¶ 10-11, 13.

98.    Under the Guidelines, the duties of post-conviction counsel include: "(1) maintain close contact with the client regarding litigation developments; (2) continually monitor the client's mental, physical, and emotional conditions for effects on the client's legal position; and (4) continue aggressive investigations of all aspects of the case." ABA Guidelines 10.15.1(B) and (E); Kendall Decl., at ¶ 7.

99.    The Guidelines also set out counsel's duties with respect to seeking clemency, which include, among other things, that counsel should conduct a thorough and independent investigation of the issues of both guilt and penalty. Guidelines 10.7 and 10.15.2(B); Kendall Decl., at ¶ 7.

100.    Maintaining close contact with the client under an active death warrant is essential in order to provide timely information about changes in the status of the proceedings and to obtain direction from the client regarding the decisions that the client is entitled to make or as to which the client is entitled to provide input. Green Decl. at ¶¶ 6, 10.

101.    Such communications require in-person meeting, in part, because of confidentiality considerations. Clients in this context are unlikely to be as forthcoming over the phone or other

remote communications because of their fear–which may be well-founded[36]–that their communications can and will be overheard. Green Decl., at ¶ 7; Kendall Decl., at ¶¶ 28, 40.

102.     In-person meetings are also necessary in order to fulfill another duty: to continually monitor the client's mental, physical, and emotional conditions for effects on the client's legal position. Kendall Decl., at ¶ 16; Green Decl., at ¶ 13.

103.     A client's mental health in the weeks and days approaching an execution can be extraordinarily fragile, and an impending execution dates adds an enormous layer of stress, anxiety, and depression on top of a client's pre-existing mental health condition. Kendall Decl., at ¶ 12.

104.     The duty to monitor a client's mental health cannot be effectively fulfilled in the absence of face-to-face interaction with the client. A proper assessment of the client's mental health requires the ability to observe such things as changes in general countenance; deteriorating hygiene; changes in skin tone and color, such as an increase in his pallor; whether the client's eyes seem glassy, glazed, unfocused, darting, or bloodshot; his ability to maintain focus in conversation and comprehend what's being said to him; his attention span; his orientation; changes from his normal speech patterns; his degree of rationality; whether he's exhibiting emotional outbursts or, perhaps, exhibiting no emotion at all; abnormal body movements like hand shaking, leg trembling, foot tapping, facial tics and verbal tics; rapidly cycling through anger, despair, confusion, magical thinking, or fantastical hopes during a single visit. *Id.*  at ¶ 16.

---

[36] *See* Dan Margolies, "Leavenworth Inmates Reach $1.45 Million Settlement Over Taped Attorney-Client Phone Calls," KCUR National Public Radio, Aug, 26, 2019 (available at: https://www.kcur.org/news/2019-08-26/leavenworth-inmates-reach-1-45-million-settlement-over-taped-attorney-client-phone-calls) (last visited July 8, 2020).

106.    Counsel's duty to monitor the client's mental health are critical because the client has many decisions he needs to make during these last weeks, which cannot be made in a meaningful fashion if his mental state deteriorates. Kendall Decl., at ¶ 14.

107.    These include not only decisions about litigation, but also about sensitive topics about the client wants his remains to be handled (cremation or burial) and how to distribute his personal effects after his execution.

108.    Counsel also has a duty to attend and witness the client's execution. Counsel's presence at Mr. Lee's execution is not merely for Mr. Lee's support, but is critical to Mr. Lee's gaining access to the courts should any aspect of the execution go awry, as has happened in other cases.[37]

109.    Counsel's presence, at and near the time of execution, is also necessary to protect Mr. Lee's other rights against arbitrary or impermissible action by the prison -- for example, if his chosen spiritual adviser were to be prevented at the last minute from entering the execution

---

[37]    *See, e.g.,* Berman, *Arizona execution lasts nearly two hours; lawyer says Joseph Wood was 'gasping and struggling to breathe,'* WASH. POST (July 23, 2014), *See also, for example,* Joseph Lewis Clark's execution by lethal injection, in 2006, which took nearly 90 minutes; Angel Nieves Diaz's execution by lethal injection, in 2006, when he needed an additional dose of drugs and the process took 34 minutes instead of the "usual" 7.5 minutes; Romell Broom's execution by lethal injection in 2009, where he cried in pain after receiving 18 needle sticks and which was called off after two hours;  Joseph Wood's execution by lethal injection in 2014, which took 2 hours, and during which he was injected with the drug cocktail 15 times, even though a single dose was to supposed to be sufficient;  Clayton Lockett, who suffered a heart attack during his execution by lethal injection in 2014; and Doyle Lee Hamm, whose execution failed in 2018, after the execution team spent more than two and a half hours, stabbing him with needles in an attempt to find a suitable vein. Michael Radelet, *Examples of Post-Furman Botched Executions*, March 1, 2018, (reporting a total of 39 botched executions by lethal injection since 1982, *and*   Austin Sarat, *Gruesome Spectacles: Botched Executions and America's Death Penalty* (Stanford Univ. Press 2014) (reporting a 7.12% of botched executions by lethal injection – 75 out of 1,054.). https://deathpenaltyinfo.org/executions/botched-executions (last visited July 11, 2020

chamber despite having been given permission to do or his family members were to be denied access to see him.

111. Consistent with Mr. Lee's constitutional rights to counsel under the Sixth Amendment, to due process under the Fifth Amendment, and to be free from cruel and unusual punishment under the Eighth Amendment, Mr. Lee's entitlement to counsel has been codified at 18 U.S.C. § 3599(e), which guarantees counsel for "all available post-conviction process, together with applications for stays of execution and other appropriate motions and procedures, and … in such competency proceedings and proceedings for executive clemency as may be available to the defendant."

112. Also consistent with these constitutional rights and 18 U.S.C. § 3599(e), the law establishes Mr. Lee's right to have counsel physically present with him in the seven days leading up to the execution. *See* 28 C.F.R. § 26.4.(b) (prisoner shall have access to his defense attorneys from seven days before the scheduled execution) and to have counsel physically present with him at the execution itself. *See* 28 C.F.R. § 26.4(c) ("In addition to the Marshal and Warden, the following persons shall be present at the execution: (ii) Two defense attorneys.").

### Legal Claim

### Agency Action in Violation of 5 U.S.C. § 706(2)(A)

113. Mr. Lee realleges and incorporates by reference all of the preceding paragraphs of the Complaint as if they were set forth fully below.

114. The APA states that a reviewing court "shall … hold unlawful and set aside agency action" that is found to be "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A).

115.    The agency action here – the setting of Mr. Lee's execution date for July 13, 2020, – is

(1) arbitrary and capricious; (2) an abuse of discretion and (3) not in accordance with law.

116.    Defendants acted arbitrarily and capriciously because, in setting Mr. Lee's execution date,

they failed to consider important issues, including the effect of COVID-19 on Mr. Lee's right

to counsel through all post-conviction and clemency proceedings, and his right to the in-person

presence and services and advocacy of counsel in the days leading up to his execution and at

the execution itself.

117.    Defendants have abused their discretion in setting Mr. Lee's execution date by choosing

a date aware of the likelihood that, because of travel restrictions and safety concerns, Mr. Lee

would be deprived of the presence counsel to which he is entitled by law.

118.    Mr. Lee's entitlement to the full services of counsel through "appeals, applications for writ

of certiorari to the United States Supreme Court, all available post-conviction process, together

with applications for stays of execution and other appropriate motions and procedures" and "in

such competency proceedings and proceedings for executive or other clemency as may be

available to the defendant" is made explicit in 18 U.S.C. § 3599(e).

119.    His right to the in-person presence and advocacy of counsel is made explicit in 28 C.F.R.

§ 26.4 which provides that beginning seven days before his execution, Mr. Lee "shall have

access only to … his defense lawyers" even as access to others may be restricted. *Id*. at §

26.4(b). The regulations further provide that "the following persons shall be present at the

execution: … (ii) Two defense attorneys." *Id*. at § 26.4(c)(ii).

120.    These robust provisions of 18 U.S.C. § 3599(e) and 28 C.F.R. § 26.4(b) and (c) reflect the

heightened need recognized by the federal government to provide a death-sentenced individual

in post-conviction proceedings through the moment of his execution with a full measure of due

process and protection against cruel and unusual punishment found in the Fifth, Sixth, and Eighth Amendments to the United States Constitution.

121.    As alleged above, Defendants have directly interfered with Mr. Lee's right to the types of service counsel is obligated to provide and given explicit entitlement to pursuant to 18 U.S.C. § 3599(e) by setting an execution date during a pandemic that has made counsel's travel and investigation hazardous, and after a three-month period during which legal visits at USP Terre Haute were entirely prohibited.

122.    Defendants have further interfered with Mr. Lee's right to counsel by setting an execution date during this pandemic, which has prevented counsel from meeting in person with Mr. Lee in the seven days prior to the execution, and is now precluding him from attending and advocating for him at his execution pursuant to the rights accorded by 28 C.F.R. § 26.4(b) and (c)(ii).  In short, Defendants' actions are not reasonable, as required by the APA.

123.    Defendants' action is also "not in accordance with law" because it effectively nullifies Mr. Lee's rights under 18 U.S.C. § 3599(e) and 28 C.F.R. § 26.4.  Defendants' actions have constructively prevented Mr. Lee's access to counsel and have rendered his rights illusory.

124.    Defendants' discretion to set execution dates is constrained by their concomitant obligations to ensure those dates do not abrogate other provisions of law with which they are bound to comply and/or not interfere with, as has happened here.[38]

---

[38]  For example, the Government would abuse its discretion by setting an execution date and refusing to change it despite being unable to conduct the execution training exercises in the time period required by the Protocol. The requirements for provision of counsel are at least as necessary to the validity of the FDPA and the regulations as are the requirements for such exercises; Defendants were not free to ignore them.

 While the COVID-19 pandemic is unprecedented, and analogies to other situations, therefore, inherently problematic, the Government's actions here are as arbitrary, capricious, and in discord with the law as they would have been if the Government had set an execution date in Louisiana

125.   Defendants easily could have avoided the foregoing violations of the APA by delaying the setting of Mr. Lee's execution date until such time as the threat of COVID-19 abates, sufficient to allow for safe travel, indoor gathering, and entry into a contaminate facility, or there is a vaccine.  However, without good cause, Defendants set this date and have refused to change it.

126.   An actual controversy exists between the parties regarding Defendants' action and, pursuant to 28 U.S.C. § §2201 and 2202, and Fed. R. Civ. P. 57, Mr. Lee requests that the Court declare his rights in connection with the setting of his execution date, and enjoin Defendants from moving forward with his execution on July 13, 2020.

127.   Accordingly, the Court should declare that Defendants have acted unlawfully, in violation of 5 U.S.C. § 706(2)(A), and it should issue a declaratory judgment setting aside Defendants' selection of July 13, 2020, as Mr. Lee's execution date.

128.   In addition, the Court should enter injunctive relief, pursuant to 28 U.S.C. § 2202 and Fed. R. Civ. P. 65, barring defendants and their agents from establishing a new execution date until they demonstrate to the Court that they will honor Mr. Lee's legally established right to counsel by setting a reasonable execution date which will not  expose counsel to an undue health risk in fulfilling their obligations to represent him in the manner contemplated by 18 U.S.C. § 3599(e), being present during the seven days prior to his scheduled pursuant to 28 C.F.R. § 26.4(b) and witnessing and advocating for him in person at his execution, pursuant to 28 C.F.R. § 26.4(c)(ii).

---

that fell during Hurricane Katrina or in the days after 9/11 when all air travel was grounded. These are all exceptional, extraordinary circumstances – as is a resurgent pandemic where attendance in Terre Haute necessarily requires travel from all over the country.

**Request for Relief**

WHEREFORE, Mr. Lee respectfully requests that this Court enter judgment in his favor and that the Court:

a.  Grant a declaratory judgment finding that carrying out Mr. Lee's execution during an escalating pandemic caused by SARS-CoV-2 and national health emergency infringes on and constructively interferes with Mr. Lee's right to counsel;

b.  Grant a declaratory judgment finding that the scheduling of Mr. Lee's execution during a national health emergency that creates substantial health risks to Mr. Lee's attorneys and prevents them from providing him with the counsel to which he is entitled, is arbitrary and capricious, constitutes an abuse of discretion and is not in accordance with law, and set aside the warrant of execution;

c.  Grant injunctive relief prohibiting the BOP from carrying out the execution until effective treatment or a vaccine is available or until the threat to health and safety in connection with travel to, and entry into, USP Terre Haute, otherwise abates;

d.  Award attorney's fees and costs as the Court deems equitable and just; and

e.  Award such other and further relief as the Court deems equitable and just.

Respectfully submitted,

/s/Amy Gershenfeld Donnella
Amy Gershenfeld Donnella
Assistant Federal Defender
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD  20770
(301) 641-6103
(301) 344-0019 (fax)
Amy_Donnella@fd.org

/s/ John P. Nidiry
John P. Nidiry
Staff Attorney
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD  20770
(301) 807-1267
(301) 344-0019 (fax)
John_Nidiry@fd.org


/s/ Elizabeth Brown Luck
Elizabeth Brown Luck
Staff Attorney
Federal Capital Habeas Project
6411 Ivy Lane, Suite 710
Greenbelt, MD  20770
(301) 456-3072
(301) 344-0019 (fax)
Elizabeth_Luck@fd.org

Dated:  July 12, 2020